Ronald Hendrix COURTNEY, Plaintiff,

v.

Albert N. REMLER, Devaul L. Henderson, Jr., Dwain E. Ball, Erling D. Speer, Bernie Hirsch, Bernie Slotin, Robert M. Crumley, James E. Wright, E.K. Van Winkle, Jr., d/b/a Hotel Investments, A Limited Partnership, Defendants.

Civ. A. No. 2:83-2347-1.

United States District Court,
D. South Carolina,
Charleston Division.

June 29, 1985.

Joel D. Bailey, Beaufort, S.C., for plaintiff.

J. Rutledge Young, Jr., Charleston, S.C., for defendants.

HAWKINS, District Judge.

The defendants move for summary judgment pursuant to Rule 56(c), Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to show the absence of any genuine issue of fact. *Adickes v. H. Kress and Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). For the reasons stated below, this court is of the opinion that the defendants' motion for summary judgment should be granted.

## FACTS AND PROCEDURAL HISTORY

On October 1, 1979, Ronald Hendrix Courtney and his wife, Deborah Marie Courtney, were honeymooning at the Islander Inn, a hotel located on Hilton Head Island, South Carolina. Two black males armed with pistols and wearing coverings over their heads forced their way into the Courtney's room, bound, gagged, and robbed them, ransacked their luggage and the room, assaulted Mr. Courtney, then raped and assaulted Mrs. Courtney.

On May 12, 1981, Mrs. Courtney brought an action in the Beaufort County Court of Common Pleas against the owners of the hotel. She alleged that the defendants were negligent and reckless in designing, constructing, maintaining, supervising and operating the hotel. Her case was removed to this court on June 9, 1981. *See, Deborah Marie Courtney v. Albert N.*

*Remler, et al.,* C/A # 81–1156–1. After extensive discovery, it was tried before this court without a jury on February 22–24, 1983. On June 29, 1983, this court issued its order finding that the defendants operated, maintained and reasonably supervised the Islander Inn, 566 F.Supp. 1225. In addition, this court held that the owners had taken reasonable measures to ensure the safety of the Inn's guest, even though they should have foreseen the possibility of criminal attacks on those guests. This judgment was appealed to the United States Court of Appeals for the Fourth Circuit. It was affirmed and the appeal dismissed on September 25, 1984, 745 F.2d 50. A motion for a rehearing *en banc* was denied by the Fourth Circuit on October 25, 1984.

In the meantime, on August 25, 1983, Mr. Courtney brought suit against the same defendants in the Beaufort County Court of Common Pleas for the loss of his wife's consortium. He also sought to recover for personal injuries sustained in the same incident. His case was likewise removed to this court. After answering and raising as a defense that Mr. Courtney was collaterally estopped from bringing his action, the defendants, on March 7, 1984, filed this motion for summary judgment. Oral arguments were heard on the motion on May 1, 1984. At that time the court held its decision in abeyance until the Fourth Circuit ruled in Mrs. Courtney's appeal.

After her case was decided by the Fourth Circuit and the petition for rehearing denied, the court asked for additional briefs on the collateral estoppel issue. These briefs were subsequently filed on October 31, 1984, by Mr. Courtney, and on November 14, 1984, by the defendants. At that time, Mr. Courtney moved to amend his complaint to add John Hamilton and Stefan Simmons, the alleged perpetrators of the assault on the Courtneys, as additional party defendants. He also moved to remand the case to the Beaufort County Court on Common Pleas because the two new criminal defendants were residents of the State of South Carolina. If the amendment was allowed, it would destroy diversity jurisdiction. Finally, Mr. Courtney moved to have guardians *ad litem* appointed for Hamilton and Stefan.

On February 14, 1985, the court heard additional oral arguments on the defendants' motion for summary judgment. Supplemental memoranda were received by the court from the defendants and the plaintiff on March 1 and 4, respectively.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Mr. Courtney brings this action in his own right and as a husband for loss of consortium and personal injuries received during the assault. The defendants argue that Mr. Courtney is collaterally estopped from litigating those issues of fact which were decided in Mrs. Courtney's case. The defendants do not argue that the husband has no right to assert a claim. Their motion is not based upon the earlier adverse judgment. However, before reaching the merits of this argument, the court finds it necessary to canvas the long and somewhat confusing South Carolina case law on loss of consortium and collateral estoppel.

In South Carolina, loss of consortium as a severable action was first recognized in the case of *Priester v. Southern Railway Company,* 151 S.C. 433, 149 S.E. 226 (1929). In that case, an action was brought by the husband to recover damages sustained by him as a result of personal injuries received by his wife in an automobile-train collision. The defendant entered a general denial and the affirmative defense of *res judicata* based upon an earlier defense verdict in the wife's case. The South Carolina Supreme Court held that an action earlier brought in the United States District Court by the wife, which resulted in a judgment for the defendant, was not a complete bar to the right of the husband to *bring* his action. The trial judge did not err in refusing to direct a verdict on the ground that a *judgment* had been entered in favor of the defendant in the United States Court. The court stated that the

causes of action in the two cases were entirely different and distinct. A judgment in favor of a defendant in one action is not a bar to an action on the other. The applicability of collateral estoppel, however, was *not* raised in the *Priester* case nor was it even discussed by the court's majority opinion.

In *Gillespie v. Ford*, 222 S.C. 46, 71 S.E.2d 596 (1952), the wife brought an action to recover for injuries sustained by her when her automobile collided with the defendant's automobile at an intersection. The complaint alleged simple negligence. At the trial of the first action, the wife testified she was driving on the wrong side of the road. The court held that her testimony, uncontradicted, would be contributory negligence *per se*. For this reason, the trial court should have directed a verdict for the defendant.

In the second action brought by the husband, *Gillespie v. Ford*, 225 S.C. 104, 81 S.E.2d 44 (1954), the complaint alleged fundamentally different and distinct acts on the part of the defendant. The simple negligence claim in the wife's case became a wilfull, wanton and gross allegation. In the second case, the wife testified that she was on the correct, or right, side of the road, not on the left. The court held that this change in testimony, while a subject for cross-examination, became a factual question for the jury which was not presented in the first case. The issue of collateral estoppel was *not* raised by the parties and not discussed by the court. The actions remained separate and distinct and the bar of *res judicata* did not apply. The analysis turned on the "new" *allegations* against the defendant coupled with the "new" *acts* of the wife.

In 1982, there was a significant change in the South Carolina common law, and the South Carolina Supreme Court expressly recognized the doctrine of collateral estoppel as a distinct and severable principle from the doctrine of *res judicata*. In *Irby v. Richardson*, 278 S.C. 484, 298 S.E.2d 452 (1982), the court held that the doctrine of collateral estoppel precluded a party from

relitigating a factual issue which was outcome determinative in previous litigation. The focus for the court deciding this legal issue is whether one had the full and fair opportunity to litigate the relevant issue effectively in a prior action. In that same year, the South Carolina Supreme Court decided *Graham v. State Farm Fire and Casualty Ins., Co.*, 277 S.C. 389, 287 S.E.2d 495 (1982). The court expanded the rule on collateral estoppel to disregard any privity requirement. *Res judicata* was distinguished from collateral estoppel. The court noted that collateral estoppel "rested upon the wholesome principal which allows every litigant one opportunity to try it case on the merits, but limits him, in the interest of the public, to one such opportunity." 277 S.C. at 391, 287 S.E.2d at 496, citing *Jenkins v. Atlantic Coastline Railroad Company*, 89 S.C. 408, 71 S.E. 1010 (1911).

In 1981, before the *Irby* and *Graham* decisions, this court held in the case of *Watkins v. M & M Tank Line, Inc.*, 527 F.Supp. 290 (D.S.C.1981), that the husband of a woman injured in an automobile-truck collision could estop the employer of the truck driver from relitigating the issue of *respondent superior* by using the doctrine of offensive collateral estoppel. By permitting the offensive use of collateral estoppel, the court held that a finding of liability in the previous loss of consortium case was dispositive of the scope of employment issue in the subsequent action.

The Fourth Circuit Court of Appeals reversed in *Watkins v. M & M Tank Lines*, 694 F.2d 309 (4th Cir.1982). It held that the South Carolina Supreme Court under *Priester, Gillespie,* and *Hiott v. Contracting Services*, 276 S.C. 632, 281 S.E.2d 224 (1981), would refuse to apply the doctrine of collateral estoppel to the facts of that case because it involved a consortium claim. It is significant, however, that the *Watkins* case involved no new allegations against the defendant. The plaintiff in *Watkins* did not seek to have the subsequent right of action or defense based on the earlier judgment. Instead, he sought to preclude the relitigation of factual issues

fully and finally decided in the earlier action.

After the decision in *Watkins*, the South Carolina Court of Appeals squarely addressed the issue. In *Beall v. Doe*, 281 S.C. 363, 315 S.E.2d 186 (1984), the court found that an owner of an automobile that struck another auto was collaterally estopped from asserting that he was not the driver of the automobile in a second case in which the identity of the driver was again in issue. The court held that non-mutual collateral estoppel may be used offensively. The doctrine was properly applied to preclude the factual issue of the identity of the driver of the automobile being relitigated in the second action. The court addressed the *Priester* line of cases and explicitly distinguished them. It agreed with the district court's decision in *Watkins v. M & M Tank Lines. Beall v. Doe*, 281 S.C. at 369, 315 S.E.2d at 190.

The Court of Appeals noted that the defense of collateral estoppel was irrelevant on the issue of whether one could prosecute a claim when there had been an earlier judgment. The sole issue to be determined was whether a party adversely affected had a full and fair opportunity to litigate the issue in a prior action. It held that a fair rule regarding the application of issue preclusion and subsequent relitigation with different parties is the rule formulated in the *Restatement* (2d) *Judgments*, § 29.[1]

The plaintiff argues that the decision in *Beall* is not binding on this court because it is not the decision of South Carolina's highest appellate court, the Supreme Court. This argument carries no weight. The Supreme Court of the United States held that federal courts are bound to follow the holdings of the highest court in the state while sitting in diversity cases. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In 1972, the Court addressed the issue of whether inferior courts of record should be entitled to the same deference. In *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408

(1972), the Court held that federal courts must follow the decisions of the Court of Appeals in Georgia in the absence of a conflicting decision of the Supreme Court of Georgia. This holding was premised upon the rationale that the Georgia Court of Appeals is a court of statewide jurisdiction and that the decisions of that court are binding on all trial courts in the absence of a conflicting decision of the Supreme Court of Georgia. The federal courts must, therefore, follow those decisions and apply them as Georgia law. 405 U.S. at 525, n. 3, 92 S.Ct. at 1107, n. 3. The *Gooding* case is merely the latest in a long line of decisions by the Court applying this principle. *Fidelity Union Trust Company v. Field*, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940). *See also, Ladnier v. Murray*, 572 F.Supp. 544 (D.Md.1983) (absent decision of the highest court of the state, federal court should follow the decisions of the intermediate appellate court unless the federal court is convinced, by persuasive data, the highest court of the state would decide otherwise); *Menzel v. County Utilities Corp.*, 501 F.Supp. 354 (E.D.Va.1979). *See also, Brumley Estate v. Iowa Beef Processor, Inc.*, 715 F.2d 996 (5th Cir.1983), (court held that the latest and most authoritative expression of state law applicable to facts is controlling.) Cf. *Louthien v. State Farm Mutual Insurance Company*, 357 F.Supp. 894 (D.S.C.1973).

■ The South Carolina Court of Appeals was created by Act # 517 of the General Assembly in 1980. By Act # 90, the General Assembly in 1983 directed that the Court of Appeals shall take effect following amendment to Article V of the South Carolina Constitution. The court was given statewide jurisdiction and was constituted as a court of record. The jurisdiction of the court is appellate and extended to all questions of law and equity. Section 14–8–200, Code of Laws of South Carolina (Cum.Supp.1984). The only cases excluded from the court's jurisdiction are those involving the death penalty, public

---

1. On January 8, 1985, the South Carolina Court of Appeals affirmed the holding of *Beall* in the case of *Liberty Mutual v. Shropshire*, 284 S.C. 234, 325 S.E.2d 566 (1985).

utility rates, elections, and the constitutionality of state or federal statutes. In all other matters the jurisdiction of the court is final, except by *certiorari* review by the South Carolina Supreme Court. For these reasons, the court finds that the decision of *Beall v. Doe* is binding on this court in the case at bar.

The court now turns its attention to applying the doctrine of collateral estoppel to this case. In the first action, Mrs. Courtney alleged that the defendants were careless and reckless in the following particulars:

In creating, through false, deceptive and misleading statements and actions, an image of the Islander Inn as being a safe and secure place for persons to stay, when they knew or, in the exercise of reasonable care, should have known that such misrepresentations would induce recipients thereof to stay in the Islander Inn, thereby exposing them to an unreasonable risk of harm.

In operating the said Islander Inn without taking such steps as were reasonably necessary in order to protect the Plaintiff and her husband from the harmful acts of others when they knew or, in the exercise of reasonable care, should have known, that similar acts were being committed in the vicinity of the Islander Inn, and were likely to occur at the Islander Inn.

In failing to provide a private security force for the protection of its business invitees, or, if such a force was provided, in selecting a force not competent to perform the necessary functions needed to insure security for guests, and in failing to properly and adequately supervise, instruct and/or train such force to take the steps necessary to protect its patrons.

In unreasonably designing, constructing and maintaining the Islander Inn in such a manner as to permit access to guest rooms by persons with criminal motives and intentions, when they knew or, in the exercise of reasonable care, should have known that such conduct would substantially increase the likelihood of injury or harm to business invitees of the said Islander Inn.

In unreasonably failing to monitor and control the conduct of persons having access to guest rooms at the Islander Inn when they knew or, in the exercise of reasonable care, should have known that such failure would substantially increase the likelihood of injury or harm to persons rightfully staying in such guest rooms.

In unreasonably failing to equip the said Islander Inn with adequate and proper protective security devices when they knew or, in the exercise of reasonable care, should have known that such failure would substantially increase the likelihood of injury or harm to business invitees of the Islander Inn.

In unreasonably failing to adopt and utilize adequate and proper security and emergency procedures designed to insure the safety of guests at the Islander Inn.

In failing to maintain the Islander Inn in a condition reasonably safe for its business invitees.

In unreasonably failing to provide adequate and proper instructions and warnings to business invitees of the Islander Inn relating to security deficiencies existing therein, when they knew or, in the exercise of reasonable care, should have known that such instructions and warnings were necessary in order to avoid the creation of an unreasonable risk of harm to such invitees, and that the absence of such warnings and instructions would prevent such invitees from taking actions necessary to insure their own safety and well-being.

Mr. Courtney, in his case, makes the same allegations of negligence. This court, after affording Mrs. Courtney a full opportunity to litigate these issues in a trial that lasted three days, found the following facts in its order of June 29, 1983:

12. There had been no assaults or any other crimes against any person occurring on the Islander Inn premises prior to the subject assault.

17. ... Quality Inns inspected and approved the property pursuant to its franchise agreement ....

18. The plaintiff and her husband arrived at the Islander Inn during the early morning hours of September 30, 1979. Upon checking in, they noticed a uniformed security guard at the reception desk.

21. Above each guest room door was a fluorescent light which provided the illumination of the hallways and the ability to see through the "observation port" located within the room side of the door.

22. The motel room (Room 220) in which the assault occurred, as all rooms, had a fire-rated steel entrance door with a steel door frame. The steel door frame was constructed with a solid metal doorstop which prevented the opening of the door by the insertion of any object between the doorstop and the balance of the frame.

23. The doors were equipped with a doorlatch with an automatic locking device. The doors closed and locked automatically.

24. The doorknob on the door was a motel security type which required the use of a key to open the door from the hall. The exterior or hallway-side portion of the doorknob contained "security lips," a mechanism utilized to deter the possible picking of the lock. The interior or room-side portion of the doorknob contained a push button whereby, when engaged, the entire exterior locking mechanism of the doorknob was secured against the possible opening of the door with either a room key or an employee's master key. For emergency situations, the management did maintain an emergency key which could override this double locking mechanism.

25. The steel doors contained a separate "dead bolt" security lock which was activated by a latch on the interior or room-side of the steel door. On the exterior of the door a "room number" plaque was secured to the door and concealed an aperture in the door that allowed the "dead bolt" to be released from the hallway.

26. The doors contained an "observation port" whereby a guest in the room could look through the same and identify a person knocking outside the door or attempting to gain entrance. This observation port contained optics providing for magnification and wide vision when looking from the inside to the outside.

29. It was the further policy of management to have the maids, when cleaning a room, leave all drapes covering the sliding glass door halfway open to allow sunlight to enter the room, and, consequently, [a] warning decal could easily have been seen. The maids were also instructed by management to replace any decals that either wore off or were torn off.

30. Room 220, on the date and time complained of, also had a telephone located therein, which was in proper working order, with instructions on the phone indicating numbers to dial direct to the front desk, the manager, and other motel offices.

31. Quality Management Co. had a planned, on-going security system which included both "in-house" personnel, as well as the utilization of a private security patrolman.

32. On a twenty-four (24) hour basis, security was provided by "in-house" personnel, including specific staff members and a security conscious awareness program extending to all employees. Housekeeping employees were charged with the responsibility of cleaning guest rooms and checking to see that the rooms were in order.

33. Certain employees were permitted to reside in efficiency units located on the Islander Inn premises.

34. Exterior lighting on the premises originally consisted primarily of low level pathway lights. The main parking area was illuminated by high intensity mercury vapor lights. There were no exterior lights on the buildings themselves. In 1978, light poles were added around the

perimeter of the premises and 150 watt light bulbs were used.

35. At the time of the rape incident, only Mr. Richard Kwaiser, the general manager of the motel, and Beverly Martin, his replacement as general manager, were assigned living quarters in the complex. Prior to the incident, as many as three to four people lived on the premises.

36. In addition to the employee security, a private security guard company, Preventor Security, was hired to provide extra security during nighttime hours. At the time of the incident, one Preventor Security uniformed guard was on duty from approximately 10:00 p.m. until 7:30 am.

Based on the foregoing findings of fact, the court concluded as a matter of law that:

Based on the lack of criminal activity on the premises in the past, one uniformed guard during the nighttime hours is reasonable security for a guest at the motel.

The entire security program was reasonable under all the circumstances.

[T]he design of the building is reasonable.

The guest room doors, with all their locking mechanisms, provided reasonable protection for the safety of the guests.

The warning system or procedure was reasonable.

The Islander Inn, as a whole, was operated and supervised reasonably. The Inn obviously felt a need to protect its guests from criminal attacks by third persons, and measures were taken to ensure their safety. The measures were reasonable. The rape incident was a truly unfortunate and horrible experience, but the defendants cannot be held responsible. For this court to hold otherwise would be equivalent to making all motels the insurer of their guests' safety.

In essence, the present plaintiff is merely attempting to relitigate issues of fact previously adjudicated by this court. None of the factors listed in *Restatement*

(2d) *Judgments*, § 29, mitigate in favor of the plaintiff. Accordingly, Mr. Courtney must be collaterally estopped from proceeding. This result is dictated notwithstanding the lack of privity between the parties. Collateral estoppel is a broad rule, which unlike *res judicata*, does not require technical privity between the parties or a requirement that the causes of action in the two suits be the same. The only requirement is that the party against whom collateral estoppel is asserted, "had a full and fair opportunity to litigate the relevant issues effectively in the prior action." *Graham*, 277 S.C. at 391, 287 S.E.2d at 496. Applying this definition of collateral estoppel to the instant case, it is apparent that the consortium and personal injury claims should be barred because in the prior judgment, exonerating all defendants, all the issues presented in the instant case were fully and fairly litigated. *See e.g., Parkland Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). It is, therefore,

ORDERED, that judgment be, and the same is hereby, entered in favor of the defendants, and that each party shall bear its own costs of this action.

AND IT IS SO ORDERED.